IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GERALD WILSON,

    Plaintiff,                    No.  2:10-cv-0721 JAM JFM (PC)

  vs.

M. McDONALD, et al.,

    Defendants.               FINDINGS AND RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Plaintiff is a state prisoner proceeding *pro se* with a civil rights action pursuant to 42 U.S.C. § 1983 against defendants Lopez, Diaz and Clark.  Plaintiff asserts that defendants Lopez and Diaz were responsible for an incident occurring on July 8, 2007 while plaintiff was incarcerated at California State Prison - Corcoran ("CSP-Corcoran").  Specifically, plaintiff asserts that Lopez and Diaz were responsible for plaintiff being placed in an upper bunk assignment.  This placement caused him injury when he fell out of the top bunk.  Lopez and Diaz's actions purportedly violated a doctor's order known allegedly known to these two defendants to only place plaintiff in a lower bunk.  Plaintiff also claims that defendant Clark was responsible for reviewing plaintiff's medical records when he was transferred to High Desert State Prison in May 2008.  He alleges that Clark failed to make sure that plaintiff was assigned a

1

lower bunk and was responsible for the care and treatment of plaintiff upon his arrival at High Desert State Prison.

   Presently pending before the court is defendants' motion for summary judgment. For the following reasons, the motion should be denied with respect to defendants Lopez and Diaz and granted with respect to defendant Clark.

## II.  SUMMARY JUDGMENT STANDARD

   Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

   If the moving party meets its initial responsibility, the burden then shifts to the

opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See FED. R. CIV. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting FED. R. CIV. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  See FED. R. CIV. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

1  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

2  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

3  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

4  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

5  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

6      On October 18, 2010 and August 9, 2012, the court advised plaintiff of the

7  requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.

8  See Woods v. Carey, 684 F.3d 934 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 957 (9th

9  Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

       III.  DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

       Defendants assert that the following are undisputed facts:

       1.  Plaintiff Gerald Wilson (B-93800) is a California prisoner who was convicted in 1995 of possession of drug paraphernalia in a jail in violation of California Penal Code § 4573.6 and sentenced to a term of 25 years to life under California Penal Code § 667 because of prior felony convictions.

       2.  Wilson was housed at the California State Prison - Corcoran (CSP-Corcoran) from November 22, 1999, to May 13, 2008, when he was transferred to High Desert State Prison (HDSP), where he is currently confined.

       3.  Defendant Lopez was the Facility 3A Administrative Segregation Unit Sergeant at CSP-Corcoran.

       3.[a]  Defendant Diaz was the Facility 3A Administrative Segregation Unit Lieutenant at CSP-Corcoran.

       4.  Defendant Clark was a licensed vocational nurse at HDSP.

       5.  On March 15, 2007, Wilson was seen by a classification committee for annual review.  At the time he was assigned to an upper bed in Facility 3A, Building 2, Cell No. 112.  The committee did not note that he had a medical chrono for lower tier/lower bunk housing.

       6.  Wilson had a history of refusing medications and mental health appointments.

       7.  On May 7, 2007, Dr. Walcott discontinued Wilson's order for Wellburtrin (buproprion), a medication used to treat depression, and instead started him on Haldol (haloperidol), two mg., one tablet, q.h.s. (every evening), for 60 days.  Dr. Walcott renewed Wilson's order for Benadryl (diphenhydramine), 25 mg, one tablet, q.h.s. for sixty days.  The medications were to stop on July 6, 2007,

4

        unless renewed.

8. Haldol is a medication used to treat psychotic disorders and severe behavioral problems, like explosive, aggressive behaviors.
9. Benadryl is an antihistamine medication commonly used to treat itching and symptoms associated with allergies and colds, but it is also used for insomnia.
10. Both Haldol and Benadryl can cause drowsiness, but the medications do not produce a deep sleep that causes a person taking them to fall out of bed while asleep, especially in the low doses prescribed for Wilson.
11. A medical chrono or Comprehensive Accommodation Chrono for a lower bunk is not medically indicated for a person simply because he is taking Haldol and Benadryl.
12. If a physician finds that an inmate should be assigned to a low bunk for health care reasons, the physician writes an order and a medical chrono stating that the inmate needs to be assigned to a low bunk for health care reasons.  The medical chrono is signed by the physician who wrote the order and by the Chief Medical Officer who must approve the medical chrono.  The inmate is given a copy of the chrono and a copy is placed in the inmate's UHR.  Because correctional officers responsible for making housing assignments do not have access to an inmate's medical record[s], a copy of the medical chrono is also placed in the inmate's CDCR central file to notify the officers that the inmate should be assigned a low bunk for health-care reasons.
13. An inmate can also ask for low bunk housing as an accommodation for a disability.  If the inmate is found to be disabled and in need of a low-bunk as an accommodation, a Comprehensive Accommodation Chrono is prepared and given to the inmate.  Like the medical chrono, copies of the Comprehensive Accommodation Chrono are placed in the inmate'[s] UHR and his CDCR central file, and a copy given to staff responsible for making housing assignments.
14. On May 28, 2007, Wilson was moved to the upper bed in Cell No. 239 in Facility 3A, Building 2.
15. On June 8, 2007, Wilson and other workers were removed from work assignments pending investigation of weapons stock found in their work area.  A prison official had earlier asked that Wilson be removed from his work assignment for provoking other inmate workers to disregard their supervisor.
16. On June 11, 2007, Wilson was charged with a disciplinary violation for hitting an officer who was trying to handcuff him after Wilson repeatedly refused to obey orders that he stop and not cross in front of a doorway from which inmates were being released from their housing unit for breakfast.

5

17. Wilson was pepper sprayed during the incident and examined that day by medical staff who noted that he reported feeling "asthmatic." No physical injuries were noted, and Wilson was returned to custody staff after being decontaminated for the effects of the pepper spray. Wilson was receiving mental health treatment at the time and was referred to mental health staff for routine evaluation.

18. Following examination by medical staff, Wilson was placed on administrative segregation status in Facility 3A, Building 3, and was assigned to the lower bunk in Cell No. 246 Facility 3A, Building 3. Wilson claims that Sergeant Lopez assigned him to the lower bunk in Cell No. 246L, and that Lieutenant Diaz approved that assignment.

19. There is no record that Wilson was seen by Dr. Kim on June 11, 2007; that Dr. Kim ordered a low bunk, or that Dr. Kim prepared a medical chrono or Comprehensive Accommodation Chrono for a low bunk.

20. There is no medical chrono or Comprehensive Accommodation Chrono that Wilson be assigned a lower bunk for health care reasons that was in effect for Wilson at any time from June 11, 2007 to May 13, 2008, while he was housed at CSP-Corcoran.

21. On June 16, 2007, Wilson asked to see a doctor because his back felt like it wanted to go out; he had low-back pain, which got worse when he sat for a long time; and it was hard for him to get up when he sat down.

22. On June 20, 2007, a doctor ordered Naprosyn (naproxen), 250 mg., two tablets, b.i.d. (twice a day), p.r.n. (as needed), for ten days for low-back pain.

23. On June 23 and 28, 2007, Wilson claimed that the naproxen was not helping his back pain, that he was unable to sleep for long; that he could not sit for long or lie down on his back; or eat.

24. The order for naproxen was not renewed when it expired on July 1, 2007.

25. Wilson's Haldol order was not renewed when it expired on July 6, 2007, because he had missed three consecutive doses.

26. Wilson was still assigned to a lower bunk in Cell No. 246 on July 8, 2007.

27. There is no record that Wilson injured his back by falling from the upper bunk in his cell at around 10:00 p.m. on July 8, 2007.

28. Wilson did not have a cellmate in Cell No. 246 on July 8, 2007.

29. There is no record that Wilson requested and was denied medical care for an injury to his back on the evening of July 8, 2007, or the next morning.

30. On August 2, 2007, a doctor saw Wilson for a complaint of low-back pain that Wilson reported having had for "two years." Wilson reported that the pain was causing

6

numbness to his left leg. The doctor ordered Motrin (ibuprofen), 400 mg., one tablet, t.i.d. (three times a day), p.r.n., for 30 days for low-back pain and omeprazole, 20 mg., one tablet, daily for 30 days for possible stomach side effects secondary to the ibuprofen. The doctor also ordered an X-ray of the lumbar spine, which showed hypolordosis (loss of curvature) in the spine), mild degenerative disc disease, and narrowing of L4-5 intervertebral disc space. The radiologist noted that magnetic resonance imaging (MRI) of the lumbar spine might be of value if disc herniation was clinically possible at the L4-5 level.

31. When Wilson was seen by a nurse practitioner of September 6, 2007, for low back pain, he again said that he had had the pain for two years, but it had increased in the previous eight months, and that the original injury occurred when he fell off a bunk at "Folsom" in 1989 or 1990. The nurse practitioner ordered an MRI of Wilson's lumbar spine, which Wilson refused on September 26, 2007, because he said he could not do the examination due to his back pain.

32. On September 27, 2007, Wilson's Ben[a]dryl order was increased to 50 mg., q.h.s., for 90 days.

33. Wilson complained on October 6, and 10, 2007, Wilson complained that he had not received any medications or treatment for low-back pain that he was having trouble walking. He was seen on October 10, 2007, and his ibuprofen dose was increased to 600 m.g., t.i.d., p.r.n. for back pain for 90 days.

34. Wilson did see Dr. Kim on October 18, 2007, for follow-up on various medical problems, including chronic low-back pain, which Dr. Kim found was due to mild degenerative disc disease (DDD) and myofascial pain. Dr. Kim ordered non-steriodal anti-inflammatory drugs (NSAIDS), as needed; hot-and-cold on back if pain flared up; and a follow-up when the results of the MRI were received. Dr. Kim noted that Wilson was not happy with the recommended treatment and said he would file an inmate appeal (CDCR 602). Dr. Kim did not order a low-bunk, nor did he write a medical chrono or a Comprehensive Accommodation Chrono for a low bunk.

35. Wilson continued to complain of back pain and was seen on October 25 and November 8, 2007. Tylenol (acetaminophen), 325 mg., one tablet, t.i.d., p.r.n., to be taken with the ibuprofen that had been prescribed, was added. The doctor did not order a low bunk or write a medical chrono or Comprehensive Accommodation Chrono for a low bunk.

36. On November 21, 2007, Wilson had an MRI of his lumbosacral spine, which showed that he had degenerative disc and joint disease and a posterior disc protrusion measuring about four millimeters at the L5/S1 level. The

7

| | | |
|---|---|---|
| 1 | | MRI was negative for appreciable impingement of the lumbar nerve roots. |
| 2 | 37. | On November 28, 2007, Wilson was moved from the lower bed in Cell No. 246 in Facility 3, Building 3, to the upper bed in Cell No. 147. |
| 4 | 38. | On December 20, 2007, a doctor saw Wilson for follow-up on the MRI. The doctor ordered non-steriodal anti-inflammatory drugs (NSAIDS), as needed; physical therapy, as needed; and a follow-up in three months. A low bunk was not ordered. |
| 6 | 39. | On December 24, 2007, Wilson's Benadryl does was increased to 50 mg., q.h.s. for 90 days. |
| 7 | 40. | In late January 2008, Wilson again complained of back pain and asked to see a doctor. He was seen on February 14, 2008, for a three-month follow up and was continued on ibuprofen, 600 mg., t.i.d., and ordered another follow-up in three months. The doctor noted that Wilson had refused physical therapy. No order for a low bunk was written. |
| 10 | 41. | On March 14, 2008, Wilson's Benadryl order was renewed for 90 days. No order for a low bunk was written. |
| 11 | 42. | On April 10, 2008, Wilson was moved from the upper bed to the lower bed in Cell No. 147. |
| 12 | 43. | On May 8, 2008, Wilson was moved from the lower bed in Cell No. 147 to the upper bed in Cell No. 117. The same day, a Public Health Nurse at CSP-Corcoran prepared a medical chrono (CDCR 128-C) concerning Wilson's tuberculosis-skin-test status. |
| 14 | 44. | Wilson was transferred to HDSP on May 13, 2008. |
| 15 | 45. | There is no record that he was seen by L.V.N. Clark. Inmates arriving at HDSP were seen by registered nurses, not licensed vocational nurses. A Health Care Transfer Information (CDCR 7371) form was signed by Registered Nurse (R.N.) Ortiz at CSP-Corcoran on May 12, 2008, and by R.N. Camacho at HDSP the next day. That form noted that Wilson had a history of asthma and chronic low-back pain and that his medical chrono (CDCR 128-C) had been reviewed by both nurses. The medical chrono referenced on the form was not one for a low bunk, but rather the May 8, 2008, tuberculosis-skin-test chrono. Wilson did not have a medical chrono for a low bunk. |
| 21 | 46. | When Wilson arrived at HDSP, a Standardized Bus Screening Form (CDCR 7277) was signed by R.N. Camacho, which included Wilson's answers to questions about his medical needs. Wilson said that he was taking ibuprofen, had 50 tablets with him, which he would have been allowed to keep. Wilson also said he was taking Benadryl, and had received a dose in Receiving and Release at CSP-Corcoran when he left that prison. The screening form also noted that the CDCR 128-C for tuberculosis-skin-test status had been completed. Wilson said he had a disability because of his back. Camacho |

noted that Wilson was being referred to be seen by a mental health care provider within fourteen days, but he was not referred to a medical care provider.
47. On a progress note (CDCR 7230), dated May 13, 2008, Physician Assistant (P.A.) Miranda noted that medications would be ordered, but not were given in Receiving and Release at HDSP that day. Miranda noted that Wilson's medical record had been reviewed, and again noted that he was being referred to see a mental health care provider in fourteen days, but not a medical care provider. P.A. Miranda noted that although Wilson reported to have a disability because of his back, there was no Disability Program Placement Verification (CDCR 1845) in his UHR. P.A. Miranda noted that Wilson had an expired Comprehensive Accommodation Chrono.
48. The same day, a doctor ordered Benadryl, 50 mg., q.p.m., for 30 days and a follow-up with a doctor and mental health staff in fourteen days.
49. The next day, May 14, 2008, Wilson was assigned to the upper bunk in Cell No. 203 in Facility C, Building 5, at HDSP.
50. On May 22, 2008, the Public Health Nurse at HDSP signed a medical chrono on the results of Wilson's tuberculosis test.
51. On May 27, 2008, a psychiatrist ordered Haldol, one mg., q.p.m., for ten days, the[n] two mg., q.p.m., for 90 days and Benadryl, 50 mg., q.p.m., for 90 days. No order, medical chrono, or Comprehensive Accommodation chrono was written for a low bunk.
52. Wilson complained on June 10, 2008, that he had not received medical care for his low-back pain since his arrival at HDSP and that he needed a low bunk, claiming that he had fallen out of his bed two times. He was seen by R.N. Flaherty on June 16, 2008, and given Tylenol (acetaminophen), 325 mg., two tablets, to be taken every four to six hours, as needed, for pain, but not to exceed 12 tablets in 24 hours. Under nursing protocol, a registered nurse can give an inmate acetaminophen. The inmate is given a bottle containing 100 tablets. That quantity should be sufficient to last a patient for a month unless he is taking the maximum number of tablets every day, 24-hours a day.
53. On July 7, 2008 Wilson complained that he was having problems walking, lying down, and sleeping because of back pain and needed a low bunk, but had not seen a doctor yet. R.N. Flaherty saw Wilson on July 9, 2008, and provided naproxen, 220 mg., two tablets in the first hour and one tablet every eight to twelve hours after, but not to exceed three table[t]s in 24 hours, as needed for pain. A notation on the form indicates that the medication was not available that day. R.N. Flaherty saw him again on July 24, 2008, ordered naproxen, which was available that day.

9

|   |   |   |
|---|---|---|
| | | Under the nursing protocol, a registered nurse can give the patient naproxen.  The patient is given a bottle containing 50 tablets.  That is enough to last a patient a month unless he takes the maximum number of tablets every day. |
| | 54. | On July 19, 2008, Wilson was moved to an upper bed in Cell No. 209 in Facility C, Building 5. |
| | 55. | Wilson submitted an inmate appeal, dated September 10, 2008, complaining that he has not received adequate medical care for his low-back injury, which this time he claimed was from falling off a bunk at CSP-Corcoran.  Wilson claimed that Dr. Kim had told him he would need to be assigned a low bed and that, on arrival at HDSP, a licensed vocational nurse told him he would be seen by a doctor within four days.  Wilson complained that he had not been seen even though he had submitted requests on May 23, July 7, and July 24, 2008.  Wilson said that having to jump up and down from his upper bed was aggravating the injury to his lower back.  He complained that he had not been given pain medication or a low bed.  A nurse responded at the informal level that Wilson would be seen by a doctor on October 6, 2008. |
| | 56. | On September 15, 2008, Wilson asked to be seen for back pain which he claimed was caused by a spine injury six months before.  R.N. Flaherty ordered acetaminophen, 325 mg., two tablets, every four to six hours, not to exceed three tablets in 24 hours, as needed for pain. |
| | 57. | On October 10, 2008, N.P. Wrigley saw Wilson for a complaint of low-back pain that, this time, he said he had for seventeen months.  N.P. Wrigley decided to order a repeat MRI because he reproted that the pain had worsened since the November 2007 MRI.  N.P. Wrigley also ordered Robaxin, 750 mg., b.i.d., for seven days, Ultram, 50 mg., b.i.d. for 90 days; and an MRI.  N.P. Wrigley also prepared a Comprehensive Accommodation Chrono for a low bunk that was approved by Dr. Nepomuceno on October 29, 2008. |
| | 58. | On October 20, 2008, N.P. Wrigley saw Wilson in response to his inmate appeal and noted that the issues raised had been addressed, but that he wanted a low bunk chrono.  N.P. Wrigley wrote another Comprehensive Accommodation Chrono that day that was approved by Dr. Nepomuceno. |
| | 60.[1] | Wilson continued to receive pain medications and, on December 10, 2008, he told N.P. Wrigley that his current medications had controlled his pain. |
| | 61. | On December 21, 2008, Wilson was assigned to the lower bunk in Cell No. 209 in Facility C, Building 5. |
| | 62. | On December 24, 2008, Wilson's inmate appeal to the |

---

[1] Defendants's submission of undisputed facts omits # 59.

|   |   |
|---|---|
|   | second level was partially granted because he had received pain medication and a repeat MRI was pending scheduling, but denied to the extent that he demanded physical therapy and an appointment with a back specialist. |
| 63. | Wilson appealed to the Office of Third Level Appeals - Health Care of the California Prison Health Care Services, where the appeal was denied on February 12, 2010. |
| 64. | An MRI on January 21, 2009, showed further degenerative changes in Wilson's lumbar spine that would be contacting spinal nerves at L3-4 and L5-S1. The degenerative changes were not caused by a fall. |

(Defs.' Statement of Undisputed Facts ("DUP") (internal citations omitted).

## IV. PLAINTIFF'S FAILURE TO COMPLY WITH LOCAL RULE 260(b)

Local Rule 260(b) states in part as follows:

> Any party opposing a motion for summary judgment or summary adjudication shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial. The opposing party may also file a concise "Statement of Disputed Facts," and the source thereof in the record, of all additional material facts as to which there is a genuine issue precluding summary judgment or adjudication.

Plaintiff's opposition to the motion for summary judgment fails to comply with the Local Rule as it does not reproduce defendants' statement of undisputed facts and admit those that are undisputed and deny those facts that are disputed. Nevertheless, because plaintiff is a *pro se* prisoner, the court "must consider as evidence in his opposition to summary judgment all of [his] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [he] attested under penalty of perjury that the contents . . . are true and correct." Jones v. Blanas, 393 F.3d 918, (9th Cir. 2004).

## V. PLAINTIFF'S AMENDED COMPLAINT

In the amended complaint, plaintiff alleges that on June 11, 2007 he was placed in administrative segregation due to an alleged assault on prison staff at CSP - Corcoran (See Dkt.

No. 28 at p. 7.) At that time he claims was seen by Dr. Kim. (See Dkt. No. 28 at p. 7.) He asserts that Dr. Kim ordered that he be placed in a lower bed "because the medications plaintiff was taken can cause the plaintiff to fall into a deep sleep and plaintiff may fall out of the top bed." (Id.) The amended complaint states that when plaintiff was initially placed in administrative segregation, both Lopez and Diaz approved and assigned him to a lower bed. (See id. at p. 8.) Plaintiff asserts that on July 8, 2007, Diaz and Lopez were responsible for moving plaintiff to another while he was in administrative segregation because another prisoner needed a lower bed. (See id. at p. 8-9.) He claims that he told Lopez at that time that he cannot be placed in an upper bed because of his medications and that Dr. Kim had ordered him to be placed in a lower bed. (See id.) The complaint asserts that plaintiff fell out of his top bed on July 8, 2007 and hit his lower back on the top table. (See id. at p. 9.) Plaintiff states that he eventually saw a doctor on September 18, 2007 for that injury and at that time Dr. Kim said he would order him moved back to a lower bed. (See id. at p. 10.)

With respect to plaintiff's claims against Clark, the amended complaint asserts that plaintiff was transferred to the High Desert State Prison on May 13, 2008. (See id.) He claims that he explained to Clark that he had a back injury and had a medical chrono for a lower bed and an order for pain medication. (See id.) The complaint alleges that Clark failed in her level of care to plaintiff as "she had the responsibility to inform the RN about plaintiff chronic care need and also to make sure plaintiff receive[d] [his] medication." (Id.) He asserts that her level of care did not meet the minimum requirements of the Eighth Amendment. (See id. at p. 12.)

## VI. DELIBERATE INDIFFERENCE STANDARD

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97 (1976); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). "In the Ninth Circuit, the test for deliberate indifference consists of two parts." Jett, 439 F.3d at 1096. First, the plaintiff must show a

serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Jett, 439 F.3d at 1096; McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled in part on other grounds by, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). "Second, the plaintiff must show the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096. A prison official is "deliberately indifferent" if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). In other words, the second prong is satisfied by the plaintiff showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096.

Prison officials demonstrate "deliberate indifference" when they are aware of the patient's condition but "deny, delay or intentionally interfere with medical treatment." Jett, 439 F.3d at 1096. "Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). Under this standard, the prison official must not only "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person 'must also draw the inference.'" Farmer, 511 U.S. at 837; Toguchi, 390 at 1057. "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Toguchi, 390 at 1057 (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)). "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842.

In applying the deliberate indifference standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice'

will not support this cause of action." Broughton v.. Cutter Labs., 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995); McGuckin, 974 F.2d at 1050. Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). A prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

## VII.  LOPEZ AND DIAZ

Defendants Lopez and Diaz assert that they were not deliberately indifferent to plaintiff's serious medical needs as they did not interfere with a medical order for a lower bunk because there was no such order. Defendants cite to Hamilton v. Endell, 981 F.2d 1062 (9th Cir. 1992), overruled in part on other grounds, Saucier v. Katz, 533 U.S. 194 (2001) in their brief in support of the motion for summary judgment. In Hamilton, the defendants made the decision to transport an inmate to Oklahoma from Alaska. In determining that the decision to force Hamilton to fly to Oklahoma could have constituted deliberate indifference to his serious medical needs, the Ninth Circuit noted that:

> the district court's denial of appellant's summary judgment motion was appropriate. The prison officials forced Hamilton to fly in contravention of his treating physician's specific orders and in total disregard for Hamilton's past experience with ear pain and injury when flying. By choosing to rely upon a medical opinion which a reasonable person would likely determine to be inferior, the prison officials took actions which may have amounted to the denial of medical treatment, and the "unnecessary and wanton infliction of pain."

Id. at 1067. Thus, Hamilton stands for the proposition that a prison official's decision to force an inmate to fly in contravention of a treating physician's specific orders could constitute deliberate

indifference.

There is a disputed issue of fact with respect to plaintiff's claims against Lopez and Diaz. Plaintiff specifically claims that he placed defendants on notice regarding an order signed by Dr. Kim with respect to his placement on a lower bunk before he was moved to an upper bunk. (See Dkt. No. 28 at p. 8-9.) At this stage of the proceedings, plaintiff's assertions must be given the benefit of the doubt. Thus, these two defendants were purportedly on notice that plaintiff should only be placed in a lower bunk per doctor's orders. Plaintiff asserts that he subsequently suffered injury when he fell out of his top bunk. Thus, Lopez and Diaz's actions in moving plaintiff to an upper bunk could be seen as interfering with plaintiff's medical treatment which could constitute deliberate indifference. See Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999) ("Our court is not alone in holding that when prison officials ignore the instructions of a treating physician they exhibit 'deliberate indifference' to the prisoner's medical needs."). In this case, plaintiff has shown that there is a disputed issue of the material fact on whether Lopez and Diaz ignored the instructions of plaintiff's treating physician which caused him injury when he fell out of the top bunk. Accordingly, summary judgment in favor of Lopez and Diaz should not be granted.

VIII.  CLARK

Plaintiff states in his complaint that LVN Clark failed in her responsibilities in reviewing the 7371 form sent from CSP-Corcoran to HDSP upon plaintiff's transfer in May 2008. (See Dkt. No. 28 at p. 10.) He states that he would not have had to suffer further injury to his back had Clark done her job properly. (See id. at p. 10-11.)

Summary judgment should be awarded in favor of Clark. Plaintiff has failed to show a material issue of fact with respect to showing that Clark made a purposeful act or failed to respond to petitioner's pain or serious medical needs. In the complaint, plaintiff asserted that when Clark allegedly saw plaintiff on May 18, 2008 that she:

> did not at that point let foreseeability, that if not notifying custody

15

> staff that plaintiff has a lower bed chrono or should be assigned a lower bed. (LVN) Clark fail in the responsibility as a Licensed Health Care Staff at High Desert State Prison by not reviewing the CDCR 7371 form from the sending institution see attached copy.

(Dkt. No. 28 at p. 10.)

Plaintiff's Health Care Transfer Information Form 7371 from CSP-Corcoran to HDSP was ultimately reviewed by RN Camacho at HDSP on May 13, 2008. The form reviewed by RN Camacho indicated that plaintiff had a history of asthma and chronic low-back pain. Additionally, RN Camacho filled out a Standardized Bus Screening Form 7277 on May 13, 2008 about plaintiff. Plaintiff responded that he did not have any special health care needs or current medical complaints. (See Dkt. No. 57-5 at p. 50.) Plaintiff also received various medications and treatment for his back pain in the weeks and months that followed his arrival at HDSP. He was seen by different medical personnel after he purportedly saw Clark upon his arrival at HDSP who treated his back pain.

At most, plaintiff's allegations regarding Clark's actions (or inactions) with respect to his back injury amount to his differing opinion on the treatment of his back pain. This is insufficient to create a material issue of fact. See Sanchez, 891 F.2d at 242 (prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference); Furthermore, the undisputed record indicates that plaintiff was seen by multiple health care personnel immediately after allegedly being seen Clark in the days and weeks after his arrival at HDSP. There is no affirmative link that Clark's purported lack of action on May 13, 2008 caused plaintiff harm. See Jett, 439 F.3d at 1096 (noting that prison's officials actions or inactions must be the cause of the harm befallen plaintiff to show deliberate indifference). He was seen by RN Camacho who reviewed his 7371 form and interviewed plaintiff to complete the 7277 form. On the 7277 form, RN Camacho noted that plaintiff had responded that he had no special health care needs or current medical complaints. Plaintiff received various treatments and medications from various medical staff at the HDSP in the aftermath of his arrival for his

back pain.  Thus, summary judgment should be granted to defendant Clark.

## IX.  CONCLUSION

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Defendant's motion for summary judgment be GRANTED IN PART AND DENIED IN PART.  The motion should be granted with respect to defendant Clark but denied as to defendants Diaz and Lopez.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 7, 2013.

*/s/ John F. Moulds*
UNITED STATES MAGISTRATE JUDGE

14
lope0721.sj